Matthias, J.
The question raised in this action in mandamus is whether the contract between the city • of Piqua and Pioneer violates the Constitution of the state of Ohio.
Although Section 4 of Article XVIII of the Ohio Constitution authorizes municipal corporations to acquire public utilities to serve their inhabitants and to contract with others for any public-utility products or services, the disposition of the surplus products or services of such utilities are strictly limited by Section 6 of Article XVIII, which reads as follows:
“Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, may also sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case 50 per centum of the total service or product supplied by such utility within the municipality.”
*461 It is obvious from a consideration of that constitutional limitation that, although the framers of the Constitution believed that it would be advantageous for municipal corporations to have the power to provide public-utility services to their inhabitants and recognized that such an operation could create a surplus product which could be disposed of outside the corporate limits of the municipality, they clearly intended to limit municipalities primarily to the furnishing of services to their own inhabitants and to prevent such municipalities from entering into the general public-utility business outside their boundaries in competition with private enterprise.
Does the present contract go beyond this limitation? Such contract provides, as to the sale of electrical energy to Pioneer, as follows:
“Subject to the terms and conditions herein stated and Article XVIII, Section 6 of the Ohio Constitution, the city agrees to sell and deliver to Pioneer Co-operative and Pioneer Co-operative agrees to purchase and receive all the electric power and energy which Pioneer Co-operative may request during the term of this agreement up to a maximum contract demand of 24,000 kilovolt amperes.”
The master found as unrealistic the contention of the Director of Law that the capacity of a power station, in kilowatts, in comparison with the highest peak load or demand, in kilowatts, imposed on the station by its outside-the-city customers, be adopted as the basis for the determination of the 50 per cent limitation imposed by Section 6 of Article XVIII. The master found from the evidence that the trade practice and general usage is to measure electrical energy in kilowatt hours.
The master, in his conclusions of law, stated:
“3. The proper test to be applied in determining whether or not a municipality is conducting its electric utility business in accordance with Art. XVTII, Sec. 6 of the Ohio Constitution is by comparison of the number of kilowatt hours supplied outside the city within a given period of time, such as a month, with the number of kilowatt hours of electricity supplied with *462 in the municipality during the same period of time. If the number of kilowatt hours supplied to noninhabitants is in excess of 50 per cent of the number of kilowatt hours supplied within the municipality, the municipality is violating Art. XVIII, Sec. 6 of the Ohio Constitution.”
We are in full accord with such finding and adopt it as the proper method of measurement.
Having determined the proper method of measurement to be applied to electrical energy in determining whether there has been a violation of Section 6 of Article XVIII, we must now apply such method of measurement to the findings of fact made by the master.
The master found:
“6. During each of the five years beginning with the year 1953 and ending with the year 1957, the city did deliver more than 50 per cent of the kilowatt hours delivered inside the city to consumers located outside of the city limits * * *. For the eight month period ending August 31,1958, the monthly outside kilowatt hour deliveries averaged 66.28 per cent of the inside kilowatt hour deliveries * * *. For the month of February 1958, the outside kilowatt hour deliveries were 75.47 per cent of those within the city H> * *.
U * * *
“8. Deliveries of electric energy to the Armco quarry and to the Inland Home plant are made outside of the city’s corporate limits, and very substantial amounts of such deliveries are consumed outside of the city’s corporate limits * * *. Even if such deliveries were considered to be deliveries inside the city, deliveries to Pioneer and other outside consumers for the first eight months of 1958 would be in excess of 57 per cent of the deliveries inside the city and exceed the 50 per cent limitation imposed by Art. XVIII, Sec. 6 of the Ohio Constitution.”
It is necessary to consider only such findings to see that the contract violates the provisions of Section 6 of Article XVIII in two respects:
I. Fi’om the above findings, it is readily apparent that the *463 city already has adequate facilities to service its own inhabitants, since its surplus at the present time is more than 50 per cent of the consumption by such inhabitants. Therefore, the acquisition or operation of the contemplated plant can only be for the creation of a greater surplus for sale outside the city, which is completely contrary to the constitutional limitation on the sale of the surplus of a service or product supplied by a municipally owned public utility to noninhabitants of the municipality.
II. It having been determined that the city is presently violating the provisions of Section 6 of Article XVIII, a sale under such contract can serve only to aggravate the existing violation.
It is contended, however, that such contract does not violate the constitutional limitation since Pioneer is a resident of the city and the electrical energy is to be delivered and metered within the city.
Keeping in mind that all Pioneer’s customers are located outside the corporate limits of the city, and that all the electrical energy sold by it to them is used and consumed outside the corporate limits of the city, we call attention to the provision of the contract regarding delivery:
“Delivery of electric power and energy hereunder by the city to Pioneer Co-operative shall be at 13,800 volts as normal at the bus bar at the city’s existing plant, and subject to a maximum variation of plus or minus five per cent (5%) above or below normal. Pioneer Co-operative shall own, install and maintain all necessary equipment required to enable it to receive the electric power and energy delivered hereunder from the 13,800 volt bus bar at the city’s plant.” (Emphasis added.)
With respect to that provision, the master commissioner found:
“7. Even though deliveries of the city’s electric energy are made at the bus bar located within the city corporation limits at the city plant, neither Pioneer nor its member consumers utilize any of such energy within the city’s corporate limits *464 * * *. Deliveries to Pioneer are deliveries outside of the city under Art. XVIII, Sec. 6 of the Ohio Constitution.”
“5. The technical delivery of electricity of the municipal public utility within the corporate limits of the municipality cannot justify the sale thereof free of the 50 percentum provision of the Ohio Constitution where the purchaser is not a bona fide ‘inhabitant’ of such municipality. Opinion No. 605, Opinion of the Attorney General of Ohio (1957), page 5. Consumers Power Co. v. City of Allegan (1929), 248 Mich., 34.”
From what we have said, it is apparent that the contract under consideration violates Section 6, Article XVIII of the Constitution of Ohio, in that it contemplates the sale for use and consumption by noninhabitants of the municipality of more than 50 per cent of the product (electricity) supplied to inhabitants thereof by a municipally owned public utility (electric power plant).
Another basic question is raised as to the validity of this contract when considered in relation to the provisions of Section 6 of Article VIII of the Ohio Constitution, which reads as follows :
“No laws shall be passed authorizing any county, city, town or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation, or association, provided:' that nothing in this section shall prevent the insuring of public buildings or property in mutual insurance associations or companies. Laws may be passed providing for the regulation of all rates charged or to be charged by any insurance company, corporation or association organized under the laws of this state or doing any insurance business in this state for profit.”
Construing sucb section in Alter v. City of Cincinnati, 56 Ohio St., 47, 46 N. E., 69, 35 L. R. A., 737, we said:
“Under Section six of Article eight of the Constitution, a city is prohibited from raising money for, or loaning its credit *465 to, or in aid of, any company, corporation, or association; and thereby a city is prohibited from owning part of a property which is owned in part by another, so that the parts owned by both, when taken together, constitute but one property.
“A city must be the sole proprietor of property in which it invests its public funds, and it cannot unite its property with the property of individuals or corporations, so that when united, both together form one property.”
In Village of Brewster v. Hill, a Taxpayer, 128 Ohio St., 343, 190 N. E., 766, we said:
“A village owning a distribution system for electric current, contracted with another to supply generating machinery for its system for the sum of $24,960, payable partly in cash and partly in deferred installments from the net revenues derived from the plant’s operation. The title to the machinery was to remain in the seller until.paid for, but the purchase price installments were not to be the general obligation of the village or payable from taxes. Upon its part the village agreed to provide housing for the machinery, to pay $5,000 in cash upon arrival of the equipment and to pay the deferred installments out of the net revenues in 60 consecutive installments after erection. Reid-. The foregoing transaction between the village and the seller of the machinery contemplates the union of the property of the village with that of the seller in a common pool, from which the net earnings of the joint enterprise would be paid to the seller. To the extent that the village devoted the whole of its own property to secure the seller, to that extent did it loan its financial credit to and in aid of the seller in violation of Section 6, Article VIII of the Ohio Constitution.”
The operation of the present contract is that the city in effect loans its land to Pioneer, and Pioneer places a mortgage on such land and returns it to the city subject to the mortgage. Thus we have the situation where land of the city which was free and clear has been encumbered for the benefit of a private corporation. Next, the city leases the land to Pioneer which places a generating plant on the land of the city, title to the *466 plant remaining in Pioneer. Thus we have ownership- of the plant in a private corporation and ownership of the land in the city. The city is then to operate such plant under a sublease as a part of its own plant, paying off Pioneer’s loan as rent. Under the terms of the mortgage, the administrator of R. E. A. can, if he so desires, take control of this part of the plant, thereby removing such control from the city.
It is clear that this is neither a situation where a city is merely leasing a part of its property to a private corporation, nor is it a situation where a private corporation is leasing its property to a city. Rather, it is the union of property owned by Pioneer and property owned by the city of Piqua, from which the net proceeds of sales to Pioneer, and more, are to be paid to Pioneer in the form of the payment of its R. E. A. loan, with the ultimate purpose of complete acquisition of title by the city. It in effect amounts to the type of conditional sale determined to be invalid in the case of Village of Brewster v. Hill, supra (128 Ohio St., 343).
The above recital is sufficient to indicate that the contract involved in the present action clearly violates the provisions of Section 6 of Article VIII of the Constitution of Ohio.
Since the contract here under consideration clearly violates both Section 6, Article XVIII, and Section 6, Article VIII, of the Constitution of Ohio, the ordinance authorizing it creates no legal duty on the part of respondents, and the writ must be denied.

Writ denied.

Weygandt, C. J., Zimmerman, Taft, Bell and Herbert, JJ., concur.
Peck, J., not participating.